# United States Court of Appeals
## For the First Circuit

---

Nos. 06-1127, 06-1358

AROOSTOOK BAND OF MICMACS,

Plaintiff, Appellee,

v.

PATRICIA E. RYAN, in her official capacity as Executive Director
of the Human Rights Commission of the State of Maine; WARREN C.
KESSLER, in his official capacity as member of the Human Rights
Commission of the State of Maine; PAUL K. VESTAL, JR., in his
official capacity as member of the Human Rights Commission of the
State of Maine; JAMES VARNER, in his official capacity as member
of the Human Rights Commission of the State of Maine; JADINE R.
O'BRIEN, in her official capacity as member of the Human Rights
Commission of the State of Maine; KRISTEN L. AIELLO, in her
official capacity as member of the Human Rights Commission of the
State of Maine, LISA GARDINER, TAMMY CONDON,

Defendants, Appellants,

BEVERLY AYOOB,

Defendant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Margaret J. Kravchuk, U.S. Magistrate Judge]

---

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Christopher C. Taub, Assistant Attorney General, with whom G.
Steven Rowe, Attorney    General, and Paul Stern, Deputy Attorney

General, were on brief, for appellants Ryan, Kessler, Vestal, Varner, O'Brien, and Aiello.

Matthew S. Keegan, with whom Johnson & Webbert, LLP was on brief, for appellants Gardiner and Condon.

Douglas J. Luckerman, with whom Law Office of Douglas J. Luckerman, Gregory P. Dorr, Farrell, Rosenblatt & Russell, and David Kaplan were on brief, for appellee.

Michael A. Duddy and Kelly, Remmel & Zimmerman on brief for Houlton Band of Maliseet Indians, amicus curiae.

———————————

April 17, 2007

———————————

**LYNCH**, **Circuit Judge**.  This case arises from a lawsuit brought by the Aroostook Band of Micmacs ("Aroostook Band"), an Indian tribe based in northern Maine.  The tribe seeks to enjoin proceedings before the Maine Human Rights Commission ("the Commission"), a state agency which acted on discrimination complaints it had received from three of the tribe's former employees.

The Aroostook Band claims that federal law prevents an agency of the state of Maine from enforcing state employment discrimination laws against the Aroostook Band's government.  The state disagrees and argues that federal law specifically grants it this power.  Both sides discuss a series of federal and state statutes: the state's 1979 Act to Implement the Maine Indian Claims Settlement ("state Settlement Act"), Me. Rev. Stat. Ann. tit. 30, §§ 6201-6214; the federal Maine Indian Claims Settlement Act of 1980 ("MICSA" or "federal Settlement Act"), 25 U.S.C. §§ 1721-1735; the 1989 state Micmac Settlement Act ("state Micmac Act"), Me. Rev. Stat. Ann. tit. 30, §§ 7201-7207; and the 1991 federal Aroostook Band of Micmacs Settlement Act ("ABMSA" or "federal Micmac Act"), Pub. L. No. 102-171, 105 Stat. 1143 (codified at 25 U.S.C. § 1721 note).  This case turns on the interpretation of these statutes.

The magistrate judge, presiding with the consent of the parties, see Fed. R. Civ. P. 73(b), concluded that the 1991 ABMSA gives the Aroostook Band the protection it claims.

-3-

We reverse. We hold that a provision of the 1980 MICSA, 25 U.S.C. § 1725(a), clearly makes the Aroostook Band "subject to . . . the laws of the State . . . to the same extent as any other person." This abrogates any aspects of tribal immunity which might have prevented application of Maine's employment laws to the dispute here. We also hold that the later-enacted ABMSA is not in conflict with, nor has it implicitly repealed, § 1725(a). We finally hold that the question in this case is resolved by these two federal statutes -- both of which are settlement acts -- and not by Indian common law.

## I. BACKGROUND

We start with the history behind the enactment of the state and federal Settlement Acts, and the later state and federal Micmac Acts. We then move to the background and procedural history of the events that led to this appeal. Much of the background, statutory and otherwise, is also recounted in an earlier opinion in this case. See Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 50-55 (1st Cir. 2005) ("Aroostook II"), overruled in part by Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 24-25 (1st Cir. 2006) (en banc).

## A.        The Statutory Background

In the 1970s, two Maine Indian tribes -- the Penobscot Nation and the Passamaquoddy Tribe -- filed suit and claimed ownership over much of the land in the state of Maine. See id. at

53; Penobscot Nation v. Fellencer, 164 F.3d 706, 707 (1st Cir. 1999). See generally Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975) (providing additional background on the litigation).

With the assistance of the federal government, the Penobscots and the Passamaquoddy ultimately reached a settlement with the state. Aroostook II, 404 F.3d at 53. The first step in this settlement was Maine's passage of its state Settlement Act in 1979. See 1979 Me. Laws 2393; see also Aroostook II, 404 F.3d at 53. Among other things, that act set out to define the legal relationship between Maine and its Indian tribes. One general provision states that except as otherwise provided by the act, all Indian tribes "shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person." Me. Rev. Stat. Ann. tit. 30, § 6204. For shorthand, we use the phrase "Maine law" to refer to the provisions invoked by the "subject to" clause.

Another part of the statute deals specifically with the two tribes that had then filed suit; it provides that the Penobscot Nation and the Passamaquoddy Tribe have the powers and limitations of Maine municipalities, and are "subject to the laws of the State," except that the State does not have the power to regulate "internal tribal matters." Id. § 6206(1). By its terms, that exception in the state act does not apply to any other tribe.

The Aroostook Band, which had not filed suit or asserted any claim, is not mentioned anywhere in the state Settlement Act. However, another Maine tribe, the Houlton Band of Maliseet Indians ("Houlton Band"), is mentioned in several places. Although by 1979 the small Houlton Band had not filed suit against the state, it too was asserting that it had valid claims to parts of land in Maine. See id. § 6202. Nevertheless, at that time Maine was "reluctant to accord [the Houlton Band] special status," Aroostook II, 404 F.3d at 54, and the Houlton Band was not originally included in the compromise. Indeed, the state Settlement Act does not by its terms grant the Houlton Band any of the benefits that it grants the Penobscots and Passamaquoddy. In its section on legislative purposes, the state Settlement Act declares that in contrast to the arrangement with the Passamaquoddy and the Penobscots, "[t]he Houlton Band . . . will be wholly subject to the laws of the State." Me. Rev. Stat. Ann. tit. 30, § 6202.

The next step was the 1980 passage of MICSA, the federal Settlement Act. See Pub. L. No. 96-420, 94 Stat. 1785. A stated purpose of the Congress enacting MICSA was to "ratify" the state Settlement Act. 25 U.S.C. § 1721(b)(3). Even so, MICSA differs from its state counterpart in several respects, including the fact that MICSA grants some benefits to the Houlton Band. Like the state act, MICSA does not mention the Aroostook Band by name, but it does address issues relevant to all Maine tribes.

MICSA extinguished the land claims of <u>all</u> Indian tribes in Maine, by express provision. <u>Id.</u> § 1723. In exchange, MICSA gave several benefits to the Passamaquoddy, Penobscots, and Houlton Band, including federal recognition for all three tribes and eligibility for certain federal Indian programs. See <u>id.</u> § 1725(i). MICSA also created a sizable trust fund for the three tribes to use for acquiring land. <u>Id.</u> § 1724(d). Of the money in the fund, $26.8 million was for the Passamoquoddy's benefit, $26.8 million was for the benefit of the Penobscots, and $900,000 was for the benefit of the Houlton Band. <u>Id.</u>

Several MICSA provisions deal with the relationship between all Maine tribes and state law. Here the statute draws distinctions. As does the state Settlement Act, MICSA treats Maine's relationship with the Passamoquoddy and Penobscots differently from Maine's relationship with all other tribes. MICSA states that

> <u>all</u> Indian[] . . . tribes or bands of Indians in the State of Maine, other than the Passamaquoddy Tribe [and] the Penobscot Nation, . . . shall be subject to the civil and criminal jurisdiction of the State [and] the laws of the State . . . to the same extent as any other person . . . therein.

<u>Id.</u> § 1725(a) (emphasis added).[1]

---

[1] There are only small exceptions pertaining to child welfare matters, <u>see</u> 25 U.S.C. § 1727(e), and land acquisition, <u>see</u> <u>id.</u> § 1724(d)(4), and the exceptions are not pertinent here, as we discuss later.

A separate subsection of the federal MICSA deals with the applicability of Maine law to the Passamaquoddy and Penobscots; that section expressly references the state Settlement Act and declares that "that Act is hereby approved, ratified, and confirmed." Id. § 1725(b)(1).

In the late 1980s, there was further legislative action. The Aroostook Band, after meeting with counsel, determined that it too might have had a potential land claim before the passage of the 1979 and 1980 state and federal settlement acts. See Aroostook II, 404 F.3d at 54. MICSA's language had, however, extinguished any potential land claim. The Aroostook Band nevertheless opened a dialogue with the state. After negotiations, the Maine legislature passed the state Micmac Act. See 1989 Me. Laws 230.

The terms of the state Micmac Act gave the Aroostook Band a status similar to that accorded the Houlton Band, and different from the status given the Penobscots and Passamaquoddy. Aroostook II, 404 F.3d at 54. The Houlton Band, mentioned explicitly in the two prior settlement acts, had been expressly made "subject to the civil and criminal jurisdiction of the State [and] the laws of the State . . . to the same extent as any other person . . . therein." 25 U.S.C. § 1725(a). As for the Aroostook Band, the state Micmac Act provided that "[e]xcept as otherwise provided in this Act, the Aroostook Band of Micmacs . . . shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of

the State to the same extent as any other person. . . therein."
Me. Rev. Stat. Ann. tit. 30, § 7203. Another provision stated
that, unlike the Passamaquoddy and the Penobscots, "[t]he Aroostook
Band of Micmacs shall not exercise nor enjoy the powers, privileges
and immunities of a municipality." Id. § 7205.

The parties now dispute whether the state Micmac Act
actually took effect as a matter of state law. The Aroostook Band
argues that the state Micmac Act is ineffective under state law, so
the clauses of that Act, cited above, do not apply and the
Aroostook Band is not subject to state law.[2] For reasons we
describe later, we think this dispute over state law is not
material.

As of the early 1990s, all of the concerned entities
apparently treated the state Micmac Act as validly enacted.
Accordingly, their next step was to persuade Congress to enact
ABMSA, the federal Micmac Act. Congress did so in 1991. See Pub.

---

[2] During committee discussions in the Maine legislature,
members of the Aroostook Band spoke in favor of passage of the
state Micmac Act. After committee deliberations, and after
discussions between the Aroostook Band and the state had ended, the
Maine legislature amended the pending Micmac bill to add an
effectiveness provision. That provision stated that the Micmac Act
would only be effective if certain contingencies were met; one of
these contingencies was a requirement that the Aroostook Band
formally certify its agreement with the act within 60 days of the
legislature's adjournment. See 1989 Me. Laws 230, 232. The
Aroostook Band was apparently unaware that this requirement had
been added, and it never submitted the certification. The other
contingencies for effectiveness, which required that ABMSA be
enacted with certain provisions, also may not have been fulfilled.

L. No. 102-171, 105 Stat. 1143.  The terms of the federal ABMSA, and the effect that they have on the earlier-enacted federal MICSA, are at the heart of the resolution of this case.

ABMSA declares, in its findings section, that the Aroostook Band was not referred to in MICSA because in 1980 there had been insufficient historical evidence of the tribe's presence in Maine.  ABMSA § 2(a)(2).  That documentation had become available, id. § 2(a)(3), and so Congress decided that it was "now fair and just" to give the Aroostook Band "the same settlement provided to the Houlton Band" in MICSA, id. § 2(a)(5).  ABMSA also states that one of its purposes is to "ratify the [state Micmac Act], which defines the relationship between the State of Maine and the Aroostook Band of Micmacs."  Id. § 2(b)(4).

Among other provisions, ABMSA provided the Aroostook Band with a $900,000 land acquisition fund, see id. §§ 4(a), 10, gave the Aroostook Band federal recognition, see id. § 6(a), and authorized the Aroostook Band to "organize for its common welfare and adopt [a governing] instrument," see id. § 7(a).  ABMSA applies federal law to the Aroostook Band in the same manner as MICSA applied federal law to the other three Maine tribes.  Id. § 6(b).  However, as to the application of Maine law, ABMSA does not repeat the language of the state Micmac Act, nor does it repeat the language of MICSA.  It has no language directly on this topic at all.  See Aroostook II, 404 F.3d at 55.  ABMSA does empower the

-10-

State and the Aroostook Band to reach their own agreement regarding Maine's jurisdiction over tribal lands, see ABMSA § 6(d), but it appears that no agreement has yet been reached that would be relevant to this case.

ABMSA also contains a "conflicts" provision: it states that if there is "a conflict of interpretation between the provisions of the [state Settlement Act, state Micmac Act, or MICSA] and this Act, the provisions of this Act shall govern." Id. § 11.

## B.        The History of this Litigation: The Maine Law Discrimination Claims Against the Aroostook Band

During 2001 and 2002, the Aroostook Band fired three of its employees: Lisa Gardiner, Tammy Condon, and Beverly Ayoob. Gardiner was the Band's Chief Financial Officer, Condon was its Compliance Officer, and Ayoob was its Housing Director. Aroostook II, 404 F.3d at 50. Gardiner and Condon alleged that they had been the victims of employment discrimination on the basis of their race, color, and national origin, in violation of the Maine Human Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5, §§ 4551-4634, and that they had been unlawfully retaliated against in violation of the MHRA and the Maine Whistleblowers' Protection Act (MWPA), Me. Rev. Stat. Ann. tit. 26, §§ 831-840.[3] Aroostook II, 404 F.3d at

---

[3] Gardiner's and Condon's claims are now the subject of related litigation in the Maine state courts. That litigation has apparently been stayed pending the outcome of this suit. See Aroostook II, 404 F.3d at 52.

-11-

51.  Ayoob also alleged she had been the victim of unlawful discrimination and retaliation under these statutes.  Id.  All three filed complaints with the Commission, a state agency which investigates discrimination charges, see Me. Rev. Stat. Ann. tit. 5, § 4566.  Aroostook II, 404 F.3d at 51.  In all three cases, the Commission in turn filed charges with the United States Equal Employment Opportunity Commission.  Id.  The Aroostook Band asked the Maine Commission to dismiss the complaints, arguing that the Commission had no jurisdiction over the Band.  Id.  The Commission refused, and it investigated the complaints.  Id.

The Aroostook Band then filed suit in U.S. District Court against the Commission's members, and against Condon, Gardiner, and Ayoob.  Id. at 51-52.  It sought declaratory and injunctive relief, asserting five claims: 1) that ABMSA and/or the Aroostook Band's inherent sovereignty prohibited the Commission from enforcing the state MHRA and MWPA against it, 2) that the Aroostook Band's sovereign immunity[4] achieved the same result, 3) that the Aroostook Band was statutorily exempt from Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, 4) that Title VII preempts application of the state MHRA and MWPA against an Indian tribe, and 5) that the Aroostook Band was not an "employer" within the meaning of either the state MHRA or MWPA statutes.

_____

[4] The complaint treated tribal sovereign immunity as a concept distinct from inherent sovereignty.  As we discuss later in the opinion, our case law has now rejected this distinction.

-12-

The magistrate judge initially dismissed all claims for lack of federal jurisdiction under Rule 12(h)(3). See Aroostook Band of Micmacs v. Executive Dir. Me. Human Rights Comm'n, 307 F. Supp. 2d 95, 96 (D. Me. 2004) ("Aroostook I"). A panel of this court reversed on the grounds that the first four claims were properly brought in federal court. See Aroostook II, 404 F.3d at 67, 69, 71, 73. The panel remanded all five claims, as there was possible pendent jurisdiction over the final state law claim. See id. at 73; see also 28 U.S.C. § 1367.

Part of the panel's opinion found that there was a distinction between tribal sovereign immunity and inherent tribal authority. See Aroostook II, 404 F.3d at 67-68. That part of the opinion was later overruled by this court's en banc opinion in Narragansett. 449 F.3d at 24-25.

On remand, the magistrate judge considered the merits of both parties' motions for summary judgment. Judgment was entered for the Aroostook Band on its first claim: that ABMSA and/or inherent sovereignty protects the tribe's employment decisions from Maine law. See Aroostook Band of Micmacs v. Ryan, 403 F. Supp. 2d 114, 130 (D. Me. 2005) ("Aroostook III"). The magistrate judge's decision predated the issuance of our en banc opinion in Narragansett.

The magistrate judge's reasoning had two primary parts. First, the magistrate judge concluded that the state Micmac Act,

with its language subjecting the Aroostook Band to state law, had never taken effect. Id. at 119-22. This failure to become effective, the judge held, was not cured by ABMSA, even though the federal act stated it was ratifying its state counterpart. Id. at 122-23.

Second, the magistrate judge concluded that while MICSA had subjected the Aroostook Band to Maine law, this aspect of MICSA was effectively and impliedly abrogated by two provisions in ABMSA: the grant of federal recognition to the Aroostook Band in § 6(a), and the authorization in § 7(a) for the Aroostook Band to organize its government. Id. at 124-30. Both provisions of ABMSA, the magistrate judge held, were in conflict with MICSA, and the conflicts were resolved in the Aroostook Band's favor pursuant to ABMSA's § 11. Id. at 124-26.

The magistrate judge permanently enjoined the Commission defendants from applying the MHRA and MWPA to the Aroostook Band, id. at 133, and also issued a declaratory judgment to similar effect against Gardiner, Condon, and Ayoob.[5] The Commission

---

[5] In light of her resolution, the magistrate judge did not reach the merits of most of the Aroostook Band's remaining claims. She dismissed the Band's claims based on tribal sovereign immunity, Title VII preemption, and interpretation of the MHRA and MWPA, as any relief on those claims would have been identical to the relief already granted. Aroostook III, 403 F. Supp. 2d at 133. The magistrate judge did enter judgment for the Aroostook Band on its third claim, which contended that the Band was exempt from Title VII. Id. at 130-31, 133. The merits of that claim were not contested, and are not a subject of this appeal.

-14-

defendants and defendants Gardiner and Condon all appealed. We consolidated the appeals, and we now reverse.

## II. AN OVERVIEW

We review de novo the magistrate judge's disposition of the cross-motions for summary judgment. <u>Jalbert Leasing, Inc.</u> v. <u>Mass. Port Auth.</u>, 449 F.3d 1, 2 (1st Cir. 2006).

There are several major strands to the Aroostook Band's argument. First, the Aroostook Band argues that MICSA did not subject the tribe's government to state employment law. Second, even if MICSA did have this effect, the tribe contends that this aspect of MICSA was abrogated by and is in conflict with ABMSA. Throughout, the Aroostook Band interprets the relevant statutes in light of its notions of inherent tribal sovereignty, as protected under federal Indian common law.

The precise question we face is whether Maine is precluded from applying its employment statutes when these statutes permit individuals employed by the Aroostook Band's government to file and pursue discrimination complaints with the Commission and through any judicial review thereafter. While the parties have argued in broad terms before us, that is the narrow issue that we decide.[6]

---

[6] Maine does acknowledge the possibility that MICSA and ABMSA did not fully abrogate the Aroostook Band's sovereignty as to all matters -- it contends, however, that the issues in this case cannot fall within the limited exception. The State's acknowledgment is only that ABMSA § 7(a) may give the Aroostook

-15-

Our conclusion is that this dispute is resolved in Maine's favor based on two federal statutes, MICSA and ABMSA, both of which were statutes designed to settle Indian claims. These settlement acts displaced any federal common law that might otherwise bear on this dispute. MICSA clearly and unequivocally establishes that Maine law applies to the Aroostook Band. And ABMSA does not either explicitly or implicitly conflict with or override MICSA on this point. It instead reinforces this aspect of MICSA.

Whether or not the state Micmac Act ever became effective under state law is not an issue we need to decide. As a federal court, we would be reluctant in any event to decide such a difficult and complex issue of state law without guidance from Maine's Supreme Judicial Court. Our analysis and the resolution of these issues turn entirely on federal law.

### III. MICSA'S EFFECT ON THE AROOSTOOK BAND

**A.**        **MICSA's Text**

Maine relies on MICSA's language to support its argument that MICSA subjected the Aroostook Band to state employment law. Specifically, MICSA declares that

---

Band independence over aspects of its own governmental and electoral structures. Cf. Narragansett, 449 F.3d at 26 (finding congressional abrogation of a tribe's sovereignty, but recognizing the possibility that the tribe still retained control over a "core group of sovereign functions").

-16-

all Indians, Indian nations, or tribes or bands of Indians in the State of Maine, other than the Passamaquoddy Tribe, the Penobscot Nation, and their members, and any lands or natural resources owned by any such Indian, Indian nation, tribe or band of Indians and any lands or natural resources held in trust by the United States, or by any other person or entity, for any such Indian, Indian nation, tribe, or band of Indians shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein.

25 U.S.C. § 1725(a). By its clear terms, § 1725(a) makes all Maine tribes, other than the Passamaquoddy Tribe and the Penobscot Nation, "subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State."[7]

The Aroostook Band argues that even while MICSA made it "subject to . . . the laws of the State," the statute did not go so far as to subject the internal tribal matters of the Aroostook Band to state law.[8] It contends that it retains authority over these

---

[7] The State also relies on a separate MICSA provision, see 25 U.S.C. § 1725(h), to argue that the federal common law doctrine of tribal sovereignty no longer has force anywhere within the State of Maine. We do not reach this argument.

[8] The Aroostook Band argues that its employment of defendants Gardiner, Condon, and Ayoob was an "internal tribal matter." For purposes of this decision, we assume that to be true for the sake of argument.

In Penobscot Nation v. Fellencer, this court determined that a tribe's employment of a community health nurse, who tended to the personal medical needs of tribal members, was an "internal tribal matter" within the meaning of the Settlement Acts. See 164 F.3d at

-17-

matters as part of its inherent tribal sovereignty. We discuss in a later section why Congress's intent in MICSA to ratify the state Settlement Act, grouped with that state statute's treatment of "internal tribal matters," defeats this claim. But in this section we also provide several other reasons to reject the argument.

1.    Statutory Clarity and the Abrogation of Sovereignty

The Aroostook Band relies on rules of statutory construction that "obligate us to construe 'acts diminishing the sovereign rights of Indian tribes . . . strictly,' 'with ambiguous provisions interpreted to the [Indians'] benefit.'" Fellencer, 164 F.3d at 709 (ellipsis and alteration in original) (internal citations omitted) (quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir. 1994); County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985)). The Aroostook Band asserts that prior to MICSA's enactment, it had the power to control all of its own employment matters as part of its inherent sovereignty. It contends that, judged against a backdrop of federal common law protecting Indian sovereignty, see Rhode Island, 19 F.3d at 701, MICSA was not clear enough to subjugate this aspect of the tribe's sovereignty to Maine law.

---

707.  Because it has not been contested, we accept arguendo the extension of Fellencer to this case. We do note that unlike in Fellencer, see id. at 710, Maine has here claimed an interest in the enforcement of its employment laws.

We disagree. Whatever powers are included within "inherent tribal authority," Congress may abrogate those powers by statute. See United States v. Lara, 541 U.S. 193, 200 (2004); Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 470-71 (1979). Although Congress must do so clearly, "there is no requirement that talismanic phrases be employed. Thus, an effective limitation . . . need not use magic words." Narragansett, 449 F.3d at 25.[9]

MICSA is clear. In § 1725(a) it not only made Maine Indians "subject to . . . the laws of the State," and "subject to the civil and criminal jurisdiction of the State," but it expressly added the emphasizing phrase "to the same extent as any other person." And § 1725(a) not only applies to "Indians," but also to the "Indian nations, . . . tribes[, and] bands of Indians" themselves. Short of using "magic words," it is hard to imagine how § 1725(a) could have been clearer. There is no "internal tribal matters" exception in the statute.

The Aroostook Band tries to interpret this clear statement by Congress as nevertheless exempting specific units of tribal government. Aided by the Houlton Band as amicus, the

_____

[9] Although this portion of Narragansett was referring to "sovereign immunity" rather than "inherent sovereignty," elsewhere in that en banc opinion we rejected the idea that there was a meaningful distinction between the two, and we explicitly overruled Aroostook II to the extent it held otherwise. See Narragansett, 449 F.3d at 24-25.

-19-

Aroostook Band sees significance in the fact that § 1725(a) does not apply state law to governing bodies like the Aroostook Micmac Council or the Houlton Band Council. Cf. 25 U.S.C. § 1722(a) (stating that the Houlton Band is "represented" by the Houlton Band Council); ABMSA § 3(1) (stating that the Aroostook Band is "represented" by the Aroostook Micmac Council). The inference we are asked to draw is that § 1725(a) applies state law to Maine tribes as "polities" but not to their governments.

This argument lacks merit. It is not a natural reading of the language and it creates an artificial distinction merely to suit tribal purposes. Further, MICSA recognizes that a governing Council exists as a representative of a tribe. See 25 U.S.C. § 1722(a). It is the tribe itself, as a legal entity, whose interest in sovereignty is really at issue.[10] See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir. 2000) (explaining that a tribal housing authority had sovereign immunity because it was "an arm of the [t]ribe");

---

[10] Indeed, it appears that it was the Aroostook Band as a legal entity that employed defendants Gardiner, Condon, and Ayoob. Both sides admitted in the district court that "the Band" employed the three individual defendants.

Additionally, as defendants Gardiner and Condon point out, the plaintiff in this lawsuit is the "Aroostook Band of Micmacs," which the complaint tells us is governed by the "Aroostook Band of Micmacs Tribal Council." All relief is requested on behalf of "the Band." If only the Band as "polity" is the plaintiff, and it is requesting relief only on behalf of itself, one wonders whether the plaintiff even has standing to advance claims on behalf of the Band as "government."

-20-

<u>Fletcher</u> v. <u>United States</u>, 116 F.3d 1315, 1324 (10th Cir. 1997) (holding that the members of a tribal government, sued in their official capacities, were protected by sovereign immunity because any relief would "run against the [t]ribe itself"). Under MICSA, § 1725(a) applies state law to "Indian nations, . . . tribes[,] or bands." That is what matters. See <u>Narragansett</u>, 449 F.3d at 30 (holding that tribal officers have no sovereign immunity when they engage in activities that the tribe itself cannot lawfully authorize).

Amicus presents another argument why § 1725(a) was not clear in its abrogation of either Houlton or Aroostook tribal sovereignty.[11] Under 25 U.S.C. § 1727(a), the Passamaquoddy and the Penobscots have the opportunity to petition for "exclusive jurisdiction" over certain child custody matters. Amicus contends that the use of "exclusive jurisdiction" here, in contrast with the use of the sole word "jurisdiction" in § 1725(a), means that § 1725(a) merely grants the state "nonexclusive authority and concurrent jurisdiction to apply [s]tate law" to tribes like the Houlton Band and Aroostook Band.

But amicus ignores the fact that elsewhere in MICSA, the Passamaquoddy and the Penobscots were "authorized to exercise

---

[11] While we are not obligated to consider points raised only by an amicus, see <u>N. & S. Rivers Watershed Ass'n</u> v. <u>Town of Scituate</u>, 949 F.2d 552, 556 n.8 (1st Cir. 1991), we nonetheless consider this and other points, in part because we have the benefit of the state's responses.

jurisdiction, separate and distinct from the civil and criminal jurisdiction of the State of Maine, to the extent authorized by the [state Settlement Act]." Id. § 1725(f). No such jurisdictional authorization was provided to the other Maine tribes, and thus we think it would clearly defeat congressional intent to nevertheless imply one. The language about "exclusive jurisdiction" in § 1727(a) is plainly nothing more than a helpful clarification in light of the peculiar jurisdictional status of the Penobscots and Passamaquoddy. It does not turn § 1725(a) into a mere grant of concurrent jurisdiction. The meaning of MICSA's § 1725(a) is clear: Maine law applies to this situation.

2. Statutory Clarity in Context: Indian Statutes in Supreme Court Case Law

The Aroostook Band attempts to undercut the clarity of MICSA by comparing it to statutes -- most notably Public Law 280 and the Menominee Indian Termination Act of 1954 -- examined in several Supreme Court cases.

MICSA stands in stark contrast to Public Law 280, Act of Aug. 15, 1953, ch. 505, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162 and 28 U.S.C. § 1360). Public Law 280 is the statute discussed in Bryan v. Itasca County, 426 U.S. 373 (1976), a case on which the Aroostook Band relies. Bryan addressed the part of the statute that gave certain states

> jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in . . . Indian country

-22-

> . . . to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State.

28 U.S.C. § 1360(a). The Court found this statute did not clearly give states civil regulatory jurisdiction over Indians, and it interpreted the ambiguity for the Indians' benefit by precluding the application of a state property tax. See Bryan, 426 U.S. at 392-93.

In finding Public Law 280 ambiguous, the Court relied on reasons that are inapplicable to MICSA's § 1725(a). First, the Court examined Public Law 280's legislative history and concluded that its civil law provisions were primarily designed to address "the lack of adequate Indian forums for resolving private legal disputes." Id. at 383; see also id. at 379-87. Viewed in this light, when Public Law 280 gave force to "the civil laws of [the] State" pertaining to "private persons or private property," 25 U.S.C. § 1360(a), it was merely providing state rules of decision and a state forum for private disputes, and it was not attempting to infringe more deeply on tribal sovereignty. Bryan, 426 U.S. at 383-84. MICSA has no such legislative history, nor does it contain similar language specifically addressed to "private" legal disputes. Cf. Narragansett, 449 F.3d at 28 (noting the narrowness of Public Law 280).

-23-

More importantly, the Court in Bryan stressed that Public Law 280 lacked "any conferral of state jurisdiction over the tribes themselves." 426 U.S. at 389. In contrast, § 1725(a) expressly does apply to Indian tribes in addition to their members.

The Aroostook Band also cites to Menominee Tribe of Indians v. United States, 391 U.S. 404 (1968), but Menominee does not assist the tribe. Menominee involved a federal statute, the Menominee Indian Termination Act of 1954, 68 Stat. 250 (repealed 1973), which stated that "the laws of the several States shall apply to the [Menominee] tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 391 U.S. at 410 (internal quotation marks omitted) (quoting 25 U.S.C. § 899 (repealed 1973)). The Supreme Court refused to read this language as abrogating certain hunting and fishing rights that the Menominee Tribe had obtained in an 1854 treaty. Id. at 412-13. The Aroostook Band asks us to reach a comparable result here as it contends that the language in the Termination Act is similar to the language in MICSA.

We disagree and find Menominee not only easily distinguishable, but in fact supportive of our reading of MICSA. Menominee's holding is not that the Termination Act alone was too unclear to abrogate aspects of tribal sovereignty. Instead, Menominee held that the Termination Act needed to be considered in pari materia with Public Law 280, which was contemporaneously

-24-

passed and which explicitly said it was not interfering with Indian hunting and fishing rights granted by treaty. Id. at 410-11. The combination of these two statutes created enough ambiguity to favor preservation of Indian rights. With MICSA there is no similar federal statute, passed roughly contemporaneously, that could create a comparable ambiguity. To the contrary, the federal statutory scheme is a consistent whole on the issue in question.

Nor is this the sole fact that distinguishes Menominee. For instance, the Termination Act was abrogating a treaty right, which meant that rules of statutory construction favoring Indians were bolstered by the rule that "the intention to abrogate or modify a treaty is not to be lightly imputed to . . . Congress." Id. at 413 (quoting Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 160 (1934)) (internal quotation marks omitted). By contrast, this case does not involve any treaty. Additionally, the Menominee Court drew support from statements by the Termination Act's chief sponsor; he had declared that the act "'in no way violates any treaty obligation with this tribe.'" Id. (quoting 100 Cong. Rec. 8537, 8538 (1954) (statement of Sen. Watkins)). The Aroostook Band has pointed to no legislative history for MICSA that is similarly so on point.

The Supreme Court's decision in South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498 (1986), puts Menominee in context and further confirms our reading of MICSA. Catawba interpreted a

-25-

statute virtually identical to the Termination Act in Menominee.
See Catawba Indian Tribe Division of Assets Act, Pub. L. No. 86-622, 73 Stat. 592 (1959) (repealed 1993).  That Catawba statute declared: "[T]he [Catawba] tribe and its members shall not be entitled to [certain federal services] . . ., and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction."  25 U.S.C. § 935 (repealed 1993); see also Catawba, 476 U.S. at 505.  Without a contemporaneously passed statute like Public Law 280 to add ambiguity, the Supreme Court found it "unmistakably clear" that "state laws apply to the Catawba Tribe and its members in precisely the same fashion that they apply to others."  Catawba, 476 U.S. at 505-06; see also id. at 509 n.20 (distinguishing Menominee on this basis).  MICSA is similarly clear.

> 3.      Statutory Clarity and The Tribal Employment Rule

Despite the statutory clarity, and the Supreme Court case law reinforcing this clarity, the Aroostook Band urges us to apply what it calls the "Tribal Employment Rule."  What it means by this is that there are a number of cases, all from other jurisdictions and involving differently situated tribes,[12] holding that general

_____

[12] Fellencer is the only cited case from this jurisdiction and it hardly helps the Aroostook Band.  That decision, which involved a former employee of the Penobscot Nation, merely interprets the "internal tribal matters" exception explicitly contained in the state and federal settlement acts.  Fellencer, 164 F.3d at 707.  Fellencer concluded that the exception applied on its facts, insulating the contested employment decision from Maine law.  Id.

-26-

<u>federal</u> employment statutes do not apply to tribal employers despite these statutes' silence on that issue. <u>See, e.g.</u>, <u>Snyder v. Navajo Nation</u>, 382 F.3d 892, 894-95 (9th Cir. 2004) (tribal employer exempt from Fair Labor Standards Act); <u>Taylor</u> v. <u>Ala. Intertribal Council Title IV J.T.P.A.</u>, 261 F.3d 1032, 1035-36 (11th Cir. 2001) (tribal employer insulated from employment discrimination claim under 42 U.S.C. § 1981); <u>NLRB</u> v. <u>Pueblo of San Juan</u>, 280 F.3d 1278, 1286 (10th Cir. 2000) (tribal employer not covered by National Labor Relations Act); <u>cf.</u> 42 U.S.C. § 2000e(b) (explicitly providing that for purposes of Title VII, the term "employer" does not include an Indian tribe).

These cases are inapposite. The fact that a tribe may be exempt from federal employment laws says little regarding that tribe's status under state employment laws, particularly where Congress has enacted settlement acts. None of these cases say that tribal employment decisions are somehow insulated from state law in the face of a federal statute that specifically applies state laws

---

at 713. No one doubts that the "internal tribal matters" exception applies to the Penobscots; the question is whether it also applies to the Aroostook Band.

-27-

to tribes.[13]  We think the "Tribal Employment Rule" is inapplicable in the face of MICSA's clarity.

**B.          The State Settlement Act and Its Relationship to MICSA**

We have held that as a matter of reading MICSA, § 1725(a) clearly subjects the Aroostook Band to Maine law in this situation. That is enough.  But because the Aroostook Band relies heavily on notions of equity, we also consider the terms of the state Settlement Act.  The terms of that act reinforce our reading of MICSA's language and intent.  Indeed, MICSA purported to ratify that state act.  See 25 U.S.C. § 1725(b)(1); see also Akins v. Penobscot Nation, 130 F.3d 482, 485 (1st Cir. 1997) (treating the "internal tribal matters" exception contained in the state Settlement Act as incorporated into federal law).

The state Settlement Act explicitly created an "internal tribal matters" exception for the Passamaquoddy and the Penobscots and not for the Houlton Band, the Aroostook Band, or any other Maine tribe.  Compare Me. Rev. Stat. Ann. tit. 30, § 6204 (providing that "[e]xcept as otherwise provided in this Act, all Indians, Indian Nations, and tribes and bands of Indians in [Maine]

---

[13] The Aroostook Band does cite one case that is more on point. See Middletown Rancheria of Pomo Indians v. Workers' Comp. Appeals Bd., 71 Cal. Rptr. 2d 105 (Cal. Ct. App. 1998).  But Middletown merely interprets the same statute, Public Law 280, which the Supreme Court dealt with in Bryan.  See id. at 112 (holding that Bryan's interpretation controlled the outcome).  We distinguished Bryan and Public Law 280 above, noting in particular the fact that Public Law 280 does not specifically apply state law to the tribes themselves.

-28-

. . . shall be subject to the laws of the State . . . to the same extent as any other person"), with id. § 6206(1) (providing that "internal tribal matters" of the Passamaquoddy and the Penobscots "shall not be subject to regulation by the state"). MICSA's choice of language echoed the state Settlement Act by providing one legal regime for the Penobscots and Passamaquoddy, and a different regime for other tribes. Compare 25 U.S.C. § 1725(a) (subjecting all Indians in Maine, "other than the Passamaquoddy Tribe, the Penobscot Nation, and their members" to state law to the same extent as any other person), with id. § 1725(b)(1) (discussing Maine's jurisdiction over the Penobscots and Passamaquoddy).

The Aroostook Band takes issue with this understanding of the state law. It argues that while the "internal tribal matters" exception in the state Settlement Act refers only to the Penobscots and the Passamaquoddy, the internal matters of all Maine tribes are free from state regulation. The Aroostook Band contends that the exception in the statute is "actually a savings clause that preserves certain aspects of inherent tribal sovereignty and self-governance rights that generally apply to all Indian tribes." It posits that such a savings clause was needed for the Penobscots and the Passamaquoddy to clarify their retained sovereignty despite their unique status as municipalities under Maine law. Since the other Maine tribes were not given municipal status, the Aroostook Band argues that no "internal tribal matters" exception was needed

for them in the state Settlement Act, so little should be inferred from congressional failure to place such an exception in MICSA.

We disagree with this innovative reading of the state Settlement Act.  It is not a rational reading of the language.  And the reading is also in tension with our precedent.  We have held that the "internal tribal matters" exception has its own unique meaning, and that it does not invoke all of Indian common law.[14] See Fellencer, 164 F.3d at 709-13 (treating Indian common law as but one factor in determining whether something is an "internal tribal matter"); Akins, 130 F.3d at 488-90 (same); see also id. at 489 (refusing to read the exception "as invoking all of prior Indian law" because "[t]hat would be inconsistent with the unique nature of the Maine settlement").  This is hardly the effect we would expect from a "savings clause."[15]

The Aroostook Band's reading of the exception is also undercut by strong evidence of legislative intent.  The state Settlement Act clearly intended to give the Penobscots and the Passamaquoddy more independence from state law than it gave the

_____

[14] Maine's highest court has expressed a similar understanding. See Penobscot Nation v. Stilphen, 461 A.2d 478, 488-89 (Me. 1983).

[15] The Houlton Band, as amicus curiae, attempts to salvage the interpretation offered by the Aroostook Band.  It contends that the Passamaquoddy Tribe and the Penobscot Nation received the less generous "internal tribal matters" exception, while all other Maine tribes retained the full extent of their inherent sovereignty. This radical interpretation finds little textual support, and is drastically at odds with the legislative history.

Houlton Band (the only other Maine tribe that asserted a claim at the time that act was passed). In its findings section, the state Settlement Act declares: "[T]he Passamaquoddy Tribe and the Penobscot Nation have agreed to adopt the laws of the State as their own to the extent provided in this Act. The Houlton Band of Maliseet Indians and its lands will be wholly subject to the laws of the State." Me. Rev. Stat. Ann. tit. 30, § 6202. It would be illogical to conclude that the Houlton Band had received the same exemptions from state law that had been granted to the two larger tribes. And if the Houlton Band was not given these exemptions, certainly the Aroostook Band did not receive them either.[16]

## IV. THE STATUS OF THE AROOSTOOK BAND UNDER ABMSA

In the previous section, we concluded that MICSA clearly subjected the Aroostook Band to state employment laws -- a conclusion we reached both from MICSA's language and from its context in relation to the state Settlement Act. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Morton v. Mancari, 417 U.S. 535, 551 (1974). We think that MICSA and the later-enacted ABMSA are capable of co-existence, and there is no clearly expressed

_____

[16] The Aroostook Band does not argue that, in 1980, the drafters of either settlement act intended to give the Aroostook Band more favorable terms than what the Houlton Band was given.

congressional intention that ABMSA makes Maine law inapplicable here despite MICSA's language.

The Aroostook Band's argument to the contrary proffers two ABMSA provisions as conflicting with MICSA: § 6(a), which gives the Aroostook Band federal recognition, and § 7(a), which authorizes the Aroostook Band to adopt a governing instrument and organize for its common welfare. When read alongside ABMSA § 11, the conflicts provision, the Aroostook Band believes that ABMSA codifies the tribe's inherent sovereignty and insulates its employment decisions from state law. In an attempt to reinforce its reading of §§ 6(a) and (7)(a), the Aroostook Band also appears to argue that ABMSA impliedly repeals parts of MICSA. We disagree with these arguments. Additionally, we disagree with the repeal argument that is offered by our dissenting colleague (and that was not advanced by the Aroostook Band).

**A.        Section 6(a): Federal Recognition**

The Aroostook Band contends that when ABMSA gave it federal recognition, it used a "term of art" that entitles the tribe to a variety of privileges and immunities.[17]  Cf. 25 C.F.R.

---

[17] ABMSA § 6(a) states:
> Federal recognition is hereby extended to the Aroostook Band of Micmacs. The Band shall be eligible to receive all of the financial benefits which the United States provides to Indians and Indian tribes to the same extent, and subject to the same eligibility criteria, generally applicable to other federally recognized Indians and Indian tribes.

-32-

§ 83.2 (explaining that recognition means that a "tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States"). Among those privileges, we are told, is freedom from the application of state law.

We flatly reject the argument. MICSA contains express terms to the contrary. It gave the Penobscots and the Passamaquoddy "federal recognition," see 25 U.S.C. § 1725(i), and yet those tribes are subject to limits that do not apply to other federally recognized tribes. See Akins, 130 F.3d at 485, 489. Compare 25 U.S.C. § 1724(e) (placing restrictions on the authority of the United States to take land into trust on behalf of Maine tribes), with id. § 465 (giving the Secretary of the Interior discretion to take lands into trust on behalf of Indian tribes).[18] Moreover, even though MICSA recognized the Houlton Band, it plainly subjected that tribe to state law to a greater extent than it subjected the Penobscots and Passamaquoddy. To interpret "recognition" as a grant of sovereignty would require us to undo this differing treatment.

---

[18] Nor is Maine the only state where Congress has made federal recognition consistent with limits on sovereignty. The Narragansett Indian Tribe is a federally recognized tribe, and it too has had aspects of its sovereignty abrogated by a similar settlement. See Narragansett, 449 F.3d at 19, 25-27.

-33-

Indeed, it is hard to see how the Congress that enacted MICSA intended recognition to be a "grant" of sovereignty at all. That Congress understood Maine tribes to be able to invoke sovereign powers even without recognition: our court had decided as much in Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1064-66 (1st Cir. 1979), and Congress was plainly aware of our holding, see H.R. Rep. No. 96-1353, at 14 (1980), reprinted in 1980 U.S.C.C.A.N. 3786, 3790 (noting Bottomly's holding regarding inherent sovereignty); S. Rep. No. 96-957, at 14 (1980) (same).

Thus we understand "recognition," at least as used in MICSA, to be merely an acknowledgment that the Passamaquoddy, the Penobscots, and the Houlton Band are eligible for particular federal tax treatment and benefits. It is telling that MICSA only grants federal recognition as part of two sentences dealing with financial benefits and taxes:

> As federally recognized Indian tribes, the Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians shall be eligible to receive all of the financial benefits which the United States provides to Indians, Indian nations, or tribes or bands of Indians to the same extent and subject to the same eligibility criteria generally applicable to other Indians, Indian nations or tribes or bands of Indians. The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians shall be treated in the same manner as other federally recognized tribes for the purposes of Federal taxation and any lands which are held by the respective tribe, nation, or band . . . shall be considered Federal Indian reservations for purposes of Federal taxation.

25 U.S.C. § 1725(i).

We have no reason to think that ABMSA's grant of "recognition" used a "term of art" that meant something different from MICSA's use of the term. Like the similar provision in MICSA, ABMSA § 6(a) grants recognition as part of a provision discussing federal financial benefits.[19] Although there are small differences in wording, those differences cannot plausibly be read as relevant to the Aroostook Band's claimed exemption from employment laws, and the Aroostook Band does not so argue.

## B.        Section 7(a): Government Organization and Documents

The Aroostook Band also points to ABMSA § 7(a) as "affirming" the Aroostook Band's right to "self-governance." The

---

[19] Citing MICSA's Senate Report, amicus argues that "recognition" in MICSA actually does have the same meaning as what the Aroostook Band attributes to ABMSA § 6(a). That Senate report comments on the state Settlement Act's stated purpose to "wholly subject" the Houlton Band of Maliseet Indians and its lands to "the laws of the State," Me. Rev. Stat. Ann. tit. 30, § 6202. See S. Rep. No. 96-957, at 35 (1980). The report states that § 6202 differs from MICSA in that the latter "will extend Federal recognition to the Maliseets . . .[, and] will provide that Maliseet land must also be taken in trust . . . which will entail exemptions from some state laws." Id.

This legislative history does little to advance amicus's position. First, the report is silent as to any conflict between MICSA's § 1725(a) and federal recognition, and it is § 1725(a) that subjects tribes like the Houlton Band and Aroostook Band to Maine law. Second, even if federal recognition is inconsistent with "wholly" subjecting the Houlton Band to state law, it is another question entirely how far any exemption goes. Under Maine's interpretation of MICSA, the Houlton Band may still retain sovereignty over certain key decisions regarding the structure of its government and its electoral process.

-35-

Aroostook Band infers that, as a result, it is not subject to state laws in this case. Section 7(a) states:

> The [Aroostook] Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of this Act. The Band shall file with the Secretary a copy of its organic governing document and any amendments thereto.

The Aroostook Band reads this language as allowing it "to determine the structure and internal operations of [its] governing body," a power which it contends gives it an exemption from state employment law.

We disagree with this extremely broad reading. First, by its plain terms, § 7(a) says nothing about conferring an exemption from state laws. It merely allows the Aroostook Band to "organize for its common welfare" and "adopt an appropriate instrument in writing to govern [tribal] affairs." The language cannot be read to exclude the Aroostook Band from discrimination suits brought by former employees.

Second, our view is strengthened by comparing § 7(a) to a similar provision in MICSA. Section 7(a) is clearly based on virtually identical language contained in MICSA's § 1726(a). That subsection stated:

> The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians may each organize for its common welfare and adopt an appropriate instrument in writing to govern

-36-

> the affairs of the tribe, nation, or band when each is acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of [this act] and the [state Settlement Act]. The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians shall each file with the Secretary a copy of its organic governing document and any amendments thereto.

25 U.S.C. § 1726(a). If we were to accept the Aroostook Band's argument about the meaning of this language, we would be forced to conclude that § 1726(a) acted to exempt the Houlton Band from the provisions of § 1725(a) (which applies Maine law to the Houlton Band).[20] That conclusion fails on the face of the statute itself: § 1725(a) contains several exceptions for other MICSA provisions, and § 1726(a) is not one of them.

---

[20] In passing ABMSA, Congress plainly did not intend to give the Aroostook Band greater benefits than it had given the Houlton Band in MICSA. As one of its stated purposes, ABMSA declares that "[i]t is now fair and just to afford the Aroostook Band of Micmacs the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims, to the extent they would have benefitted from inclusion in [MICSA]." ABMSA § 2(a)(5); see also id. § 2(a)(4) ("The Aroostook Band . . . is similar to the Houlton Band . . . and would have received similar treatment under [MICSA] if the [historical] information available today had been available . . . [in 1980]"). ABMSA's Senate committee report reinforces that view. See S. Rep. No. 102-136, at 1 (1991) ("The bill will extend to the Aroostook Band . . . the same compensation, rights and benefits as were provided to the Houlton Band . . . in [MICSA]"). Indeed, ABMSA authorizes a $900,000 appropriation for Aroostook land acquisition, see ABMSA §§ 4(a), 10, the same amount that MICSA authorized for Houlton land acquisition. And despite the Aroostook Band's suggestions otherwise, nothing in Aroostook II contradicts our conclusion that similar treatment was envisioned.

Indeed, the Aroostook Band's argument amounts to a claim that ABMSA § 7(a) (and MICSA's § 1726(a)) provide the functional equivalent of the "internal tribal matters" exception granted to the Passamaquoddy and the Penobscots. They plainly do not. Congress invoked different language, and it intended different treatment of the Passamaquoddy and Penobscots on the one hand, and the remaining Maine tribes on the other.[21]

While it is not necessary to consult legislative history at all, that history reveals that MICSA's § 1726(a) -- and thus ABMSA § 7(a) -- cannot be read as the equivalent of the "internal tribal matters" exception. Rather, the language in § 1726(a) was meant to serve an entirely different purpose. The language was added at the suggestion of the Secretary of the Interior, Cecil Andrus, who saw a "conceptual problem" with the fact that the Penobscots and the Passamaquoddy were given municipal status under the state Settlement Act. See Proposed Settlement of Maine Indian Land Claims: Hearings on S. 2829 Before the S. Select Comm. on Indian Affairs, 96th Cong. 38 (1980) [hereinafter MICSA Senate Hearings] (statement of Secretary Andrus). Maine municipalities derive their authority from charters, and Secretary Andrus noted that the tribes would have no charters, constitutions, or other

_____

[21] The Aroostook Band points us to the IRS's determination that the tribe exercises "governmental functions" for the purposes of certain provisions in the Internal Revenue Code. See Rev. Proc. 2002-64, 2002-2 C.B. 717. This is wholly beside the point, and offers no assistance in our interpretation of ABMSA.

governing documents.  Id. at 37-38.  Additionally, because the tribes were going to be have large land holdings, the Secretary thought it advisable that they adopt organic governing documents, and that these be on file with the Department of the Interior.  See Letter from Cecil D. Andrus, Secretary, United States Department of the Interior, to John Melcher, Chairman, Senate Select Committee on Indian Affairs (Aug. 8, 1980), reprinted in MICSA Senate Hearings at 95, 103.  These rationales have nothing to do with inherent sovereignty.[22]

The Aroostook Band disputes this reading of MICSA's legislative history by pointing out that § 1726(a) was based on similar language in the Indian Reorganization Act ("IRA"), Pub. L. No. 73-383, § 16, 48 Stat. 984, 987 (1934) (codified as amended at 25 U.S.C. § 476).  See MICSA Senate Hearings at 38 (statement of Secretary Andrus) (referring to the IRA).  In light of the IRA's clear purpose of furthering tribal self-government, see Kerr-McGee Corp. v. Navajo Tribe of Indians, 471 U.S. 195, 199 (1985), the

_____

[22] Amicus points to other bits of legislative history, but they do not provide the needed support for the Aroostook Band's arguments.  Amicus cites Secretary Andrus's testimony that his proposal would "clarify the jurisdictional relationships and . . . provide for viable tribal governments in the future."  MICSA Senate Hearings at 38 (statement of Secretary Andrus) (emphasis added).  Yet context shows that this statement was made in regard to the confusion surrounding the municipal status of the Passamaquoddy and the Penobscots.  It does not appear that the statement was intended to apply to other tribes.  In any event, the reference to "viability" seems to refer merely to ensuring the tribe has a clear, written, source of governing authority.  There is no indication it has a broader meaning.

Aroostook Band contends that § 1726(a) also vests tribes with "full[] . . . self-governing authority." But this case does not involve construction of the general terms of the IRA. It instead involves the interpretation of more specific laws, whose interpretation we have explained. Indeed, the Aroostook Band has pointed us to no authority interpreting the relevant section of the IRA, § 16, to have the meaning that the tribe urges on us.[23]

## C.        **Remaining ABMSA Arguments**

### 1.        ABMSA as a Repeal of MICSA: The Aroostook Band's Position

The Aroostook Band makes another argument, designed to advance its claim that ABMSA §§ 6(a) and/or 7(a) give it an exemption from state employment laws. It points to the fact that two ABMSA sections, 6(b) and 8(a), specifically invoke parts of MICSA as applicable to the Aroostook Band. Section 1725(a) is not one of the specifically invoked provisions. The Aroostook Band posits that if Congress had intended § 1725(a) to apply to it as well, then ABMSA would have said so. Otherwise, the Aroostook Band

_____

[23] This omission is glaring because the Aroostook Band asserts that § 1726(a) took language with "well-established meaning" in the IRA. In fact, a leading casebook seems to suggest that the meaning of § 16 is very much in doubt. See Getches et al., Cases and Materials on Federal Indian Law 196 (5th ed. 2005) (noting the paucity of litigation about the IRA's terms); see also id. (wondering whether § 16 actually grants tribes any substantive powers).

reasons, the specific inclusions in §§ 6(b) and 8(a) would be "meaningless surplusage."[24]

At its core, this is an argument about congressional intent, and it is one that we reject. Courts rarely presume that a statute's failure to invoke a prior statute will reflect an intent to repeal, see Morton, 417 U.S. at 549-50, although in an appropriate case this rule can be overcome by the Indian canons of construction, see, e.g., Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). In any event, ABMSA's failure to reference MICSA's § 1725(a), or to repeat that section's language, is easily explained: Congress likely saw no need to do so in light of both MICSA and the state Micmac Act. ABMSA clearly contemplates that the state Micmac Act will have effect. See ABMSA § 6(d) (consenting to amendments to that law). And the state Micmac Act

---

[24] It is a significant overstatement to claim that § 8(a)'s reference to MICSA would be "meaningless surplusage" under Maine's reading of the relevant statutes. The first part of § 8(a) includes the Aroostook Band in the Indian Child Welfare Act, a federal statute. Without clarification, this part of § 8(a) would raise a real question whether the Indian Child Welfare Act continues to have force in Maine. See 25 U.S.C. § 1725(h) (making federal laws inapplicable in Maine if they give Indians special benefits and they "affect[] or preempt[]" Maine's jurisdiction). Thus the second half of § 8(a) plainly adds a needed proviso: "[n]othing in this section shall alter or affect the jurisdiction of the State of Maine over child welfare matters as provided by [MICSA]."

contains language nearly identical to MICSA's § 1725(a).[25]  The Aroostook Band's reading is implausible.

There is another possible explanation for the failure to reference § 1725(a), but it is also detrimental to the Aroostook Band's argument.  The two ABMSA provisions that the Aroostook Band cites for their explicit references to MICSA, §§ 6(b) and 8(a), do not deal with the application of <u>Maine</u> law.  Instead, both deal with the application of <u>federal</u> law.  That ABMSA did not specifically repeat § 1725(a) may simply reflect this differing subject matter.

2.    ABMSA as a Repeal of MICSA: The Dissent's Position

Our dissenting colleague offers a different interpretation of ABMSA.  The dissent does not argue that there are provisions in ABMSA that <u>affirmatively</u> grant the Aroostook Band sovereign powers.  Nor does the dissent dispute our pre-ABMSA reading of MICSA.  The dissent even accepts that the Congress that enacted MICSA, the Congress that enacted ABMSA, and the Maine Legislature, never intended to give the Aroostook Band even the

---

[25] <u>Compare</u> Me. Rev. Stat. Ann. tit 30, § 7203 ("[T]he Aroostook Band of Micmacs and all members . . . shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person . . . ."), <u>with</u> 25 U.S.C. § 1725(a) ("[All Maine tribes and Indians], other than the Passamaquoddy Tribe, the Penobscot Nation, and their members . . . shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person . . . .").

relatively narrow protections from state law that the tribe now claims. Nonetheless, the dissent interprets ABMSA to yield the paradoxical conclusion that ABMSA accidentally restored full sovereign rights to the Aroostook Band -- making it the sole Maine tribe with such extensive independence from state law. We decline to reach a result that we can be fully confident Congress did not intend. Cf. Griffin v. Oceanic Contractors, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available.").

To reach its paradoxical result, the dissent offers the following syllogism. First, the dissent contends that ABMSA essentially repealed MICSA insofar as MICSA dealt with the relationship between Maine law and the Aroostook Band. This is because, in the dissent's view, Congress intended for the state Micmac Act to deal with the issue. Second, the dissent contends that the state Micmac Act never became effective as a matter of state law, due to irregularities in its passage. Third, the dissent argues that despite Congress's allegedly very strong intent for the state Micmac Act to govern this issue, Congress's intent was apparently not quite strong enough for it to have succeeded in ratifying the relevant portions of the state Micmac Act into federal law. Finally, faced with an apparent legal void on the

issue, the dissent concludes that the "default option" must necessarily be the full scope of federal Indian common law.

This view of ABMSA diverges significantly from the interpretation offered by the Aroostook Band. Indeed, the dissent goes far beyond the position that the Aroostook Band advocates.[26]

In any event, we disagree with the dissent's view that ABMSA supplanted MICSA's § 1725(a) insofar as that MICSA provision applied Maine law to the Aroostook Band. Although the dissent acknowledges that we must attempt to construe MICSA and ABMSA consistently unless Congress has clearly expressed otherwise, see Morton, 417 U.S. at 551, the dissent nevertheless concludes that ABMSA effects a repeal of the relevant part of MICSA by "explicitly deferring to [the state Micmac Act] on the issue of state jurisdiction." Post, at 59.

The dissent first points out that Congress did not simply amend MICSA to add the Aroostook Band, but rather enacted a separate statute. Yet that can hardly carry significant weight -- the fact that Congress enacted a separate statute is the whole

---

[26] The Aroostook Band's implied repeal argument was made only to advance its claim that certain provisions of ABMSA provide affirmative grants of sovereignty. See Principal Br. for the Appellee at 54-56. Indeed, the portion of the brief cited by the dissent was taken from a section titled "ABMSA §§ 6(a) and 7(a) Conflict Sharply with MICSA." See id. at 54. Although we disagree with the Aroostook Band's interpretation of ABMSA §§ 6(a) and 7(a), we acknowledge its attempt to advance a view of the statutory scheme that it simultaneously claims was intended by Congress. Amicus also does not present the dissent's interpretation.

-44-

reason why we must apply cases like Morton and the statutory canons that deal with the effect of a later statute on an earlier one. See, e.g., Morton, 417 U.S. at 537 (seeking to determine the effect of a later-enacted statute on a separate earlier-enacted one).

The dissent also finds persuasive the fact that ABMSA §§ 6(b) and 8 specifically reference MICSA, and the dissent concludes that the rest of MICSA must have been intentionally omitted. Yet as we explained above, the fact that ABMSA did not explicitly invoke MICSA's § 1725(a) may well have been because the state Micmac Act contained nearly identical language.

The dissent seizes on this, contending that it demonstrates Congress's belief that § 1725(a) was no longer pertinent. But the dissent's conclusion is too hasty. There is no reason to believe that Congress intended to repeal § 1725(a) insofar as it provided a default rule in the event that the state Micmac Act were ineffective for some reason.[27]

---

[27] Indeed, the dissent's position essentially conceives of ABMSA as containing an (unwritten) clause that repeals part of § 1725(a) in favor of the state Micmac Act. See post, at 59 ("By explicitly deferring to the [state Micmac Act] . . . ABMSA states, in effect, that MICSA is no longer the governing law on the Micmacs' relationship with the State."). But can such a "clause" continue to be valid if it were later determined that the state Micmac Act never became law?

That scenario resembles situations in which a new statute arguably repeals an earlier statute, but the new statute is ultimately found unconstitutional. As the Sixth Circuit has recognized, it is well established that an invalid statute "does not repeal a prior statute on the subject when a contrary construction would create a void in the law which the legislative body did not intend. The prior statute is 'revived' to avoid a

Perhaps in recognition of this distinction, the dissent acknowledges that our position would have significant force if MICSA and the state Micmac Act contained identical jurisdictional provisions. Yet the dissent argues that they are not the same because while MICSA's § 1725(d)(1) contains a "sue and be sued" provision, the state Micmac Act does not. Notably, the dissent does not contend that MICSA's § 1725(a) is meaningfully different from its sister provision in the state Micmac Act. Of course, it is § 1725(a), and not § 1725(d)(1), that applies state law to the Aroostook Band in the ways relevant to this appeal.

Furthermore, the dissent's position is internally inconsistent. The dissent concludes that ABMSA "does not directly refer to the State's jurisdiction." Post at 67. Yet it also finds that Congress displaced MICSA's allocation of jurisdiction with the state Micmac Act. Because (in the dissent's view) the state Micmac Act was not effective, the dissent assumes that Congress must have preferred a void in the law over a reinstatement of MICSA's acknowledgment of state jurisdiction in disputes such as this.

Even if ABMSA had supplanted MICSA in favor of the state Micmac Act, the correct conclusion would be that ABMSA had simultaneously ratified the relevant provision of that act into

chaotic hiatus in the law." White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 261 (6th Cir. 1983). Although our situation is not perfectly analogous, similar principles counsel avoiding an interpretation that would lead to an unintended "void in the law."

federal law.  Cf. Mattingly v. District of Columbia, 97 U.S. 687, 690 (1878) (explaining that Congress can ratify earlier proceedings, notwithstanding the fact that the earlier proceedings were procedurally irregular, "if the irregularity consists in the . . . mode or manner of doing some act . . . which [Congress] might have made immaterial by prior law").

Thus, notwithstanding the dissent's arguments, we believe that MICSA's § 1725(a) continues to govern the relationship between Maine law and the Aroostook Band.  And even if it did not, we would conclude that a virtually identical provision in the state Micmac Act, Me. Rev. Stat. Ann. tit. 30, § 7203, had been ratified into federal law with similar effect.  Under either scenario, the Aroostook Band is subject to the state laws at issue in this appeal.

3.    ABMSA and the Status of the Houlton Band

A final set of arguments about ABMSA, and its interplay with MICSA, comes from the Houlton Band as amicus curiae.  These arguments are also without merit.

First, amicus notes that while MICSA's § 1725(a) subjects Maine tribes to state law, that provision also contains exceptions for §§ 1724(d)(4) and 1727(e).  Amicus reads those two provisions as "authoriz[ing] the State and the [Houlton] Band to separately negotiate jurisdictional and other terms."  Amicus adds that because these exceptions are introduced by the language "[e]xcept

as provided in," rather than the word "notwithstanding," Congress failed to express an intent to generally subject the Houlton Band to state law. The further inference we are apparently supposed to make is that ABMSA has a similar intent (or lack thereof) regarding the Aroostook Band.

This argument is misguided. Whatever the difference between the phrases "except as provided in" and "notwithstanding," it does not bear the weight amicus assigns. By using "except as provided in," Congress clearly expressed its view in MICSA that state law will apply to Maine tribes unless one of the two exceptions applies. These two statutory exceptions have nothing to do with the application of state law in this case. One, § 1727(e), pertains solely to child welfare matters. The other, § 1724(d)(4), is clearly limited to arrangements for Houlton Band land acquisition, and the tax consequences that will flow from that.

Second, amicus argues from MICSA's § 1725(e)(2), which provides:

> Notwithstanding the provisions of [§ 1725(a)], the State of Maine and the Houlton Band of Maliseet Indians are authorized to execute agreements regarding the jurisdiction of the State of Maine over lands owned by or held in trust for the benefit of the band or its members.

Amicus reasons from this that Congress wanted Maine and the Houlton Band to form their own agreement regarding Maine's jurisdiction, and thus Congress did not intend MICSA to contravene the Houlton

-48-

Band's sovereignty (with the inference, again, that Congress intended a similar effect for the Aroostook Band in ABMSA).

Amicus misses the mark. While Congress contemplated the state and Houlton Band negotiating over certain matters, it also clearly set the baseline from which that negotiation would proceed. Indeed, § 1725(e)(2) clearly states that any negotiated agreement would be an exception to § 1725(a). Since there is no pertinent agreement here, § 1725(a) controls, and the Houlton Band's sovereignty has been abrogated (with the further implication that any inferential argument applicable to the Aroostook Band would be foreclosed).

## V. OTHER ARGUMENTS

In the previous sections, we concluded that MICSA subjects the Aroostook Band to claims of employment discrimination under state law, and that this is not altered by ABMSA. The Aroostook Band argues that even if this is so, there are two other reasons why we should uphold the magistrate judge's decision. We reject both reasons.

First, the Aroostook Band argues that its sovereign immunity protects it from the jurisdiction of the Maine courts, even if the Aroostook Band is in fact subject to substantive Maine law. But the language of § 1725(a) clearly subjects the Aroostook Band to not only the civil and criminal jurisdiction of "the State," but also the jurisdiction of its courts. Also, the

Aroostook Band's argument relies on a distinction between inherent sovereignty and sovereign immunity that this court has rejected. See Narragansett, 449 F.3d at 24-25.

The Aroostook Band next contends that this court must engage in Bracker preemption analysis. See White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980). When it applies, Bracker analysis has two parts: state law may be preempted either because of the application of federal law, or because of inherent tribal sovereignty. See id. at 142-43; see also New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333-34 & n.16 (1983). But Bracker analysis does not apply in cases where a federal settlement act applies state law to a tribe. See Narragansett, 449 F.3d at 22-23.[28]

## VI. CONCLUSION

The parties have not challenged the magistrate judge's finding that the Aroostook Band is exempt from Title VII, and we do not disturb that conclusion. In all other respects, we reverse the magistrate judge's decision.

---

[28] Narragansett's holding regarding Bracker is properly applied to this fact pattern. Settlement act cases like this one involve a federal statute that clearly subjects a tribe to state law by abrogating that tribe's inherent sovereignty. It would be inconsistent to nevertheless conclude, under Bracker, either that federal law wishes a different result than a statute's plain meaning, or that a tribe's sovereignty continues in force despite abrogation. Saying that Bracker is inapplicable in a case like this is merely a shorthand way of saying that a federal statute has already balanced the competing factors.

-50-

The magistrate judge did not rule on several of the Aroostook Band's alternative claims for relief: count 2, regarding sovereign immunity, count 4, regarding Title VII preemption, and count 5, regarding interpretations of state employment law. But the sovereign immunity claim was briefed to us as an alternative ground for affirmance, we have rejected it, and it is now foreclosed. The other two claims -- Title VII preemption of state law and the state law interpretive question based on pendent jurisdiction[29] -- are remanded.

The judgment is <u>reversed</u> and <u>remanded</u>. Costs are awarded to the defendants-appellants.

**-Dissenting opinion follows-**

---

[29] The magistrate judge did not decide whether to exercise pendent jurisdiction over count 5, <u>see</u> <u>Aroostook III</u>, 403 F. Supp. 2d at 132, and we express no opinion on that issue.

**LIPEZ**, <u>Circuit Judge</u>, dissenting. The majority considers at length whether the Maine Indian Claims Settlement Act ("MICSA") authorizes the State to enforce its employment discrimination laws against the Aroostook Band of Micmacs and concludes that it does. In my view, however, MICSA no longer governs the relationship between the Band and the State. Instead, the federal Aroostook Band of Micmacs Settlement Act ("ABMSA") replaced MICSA in 1991 as the federal law governing the Band's status, including its relationship with the State of Maine.

I recognize that all relevant parties – Congress, the State and the Band – assumed that ABMSA's passage would leave the Band subject to Maine law. ABMSA, however, relied solely on the State's Micmac Settlement Act ("MSA") to establish Maine's jurisdiction over the Band.[30] That reliance makes the effectiveness of the state statute critical to the outcome of this case. I agree with the magistrate judge that, with at least one prerequisite unmet, MSA was never validly enacted, and the jurisdiction asserted by Maine and anticipated by Congress never took effect. Consequently, I conclude that the Band is not subject to the Maine employment discrimination laws at issue in this case. Respectfully, therefore, I dissent.

---

[30] ABMSA § 2(b) provides, in relevant part: "It is the purpose of this Act to – (4) ratify the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs."

The majority's discussion of "The Status of the Aroostook Band under ABMSA" is devoted primarily to addressing, and rejecting, potential conflicts between MICSA and ABMSA. My colleagues specifically consider whether ABMSA's provisions on federal recognition and self-government, §§ 6(a) and 7(a), conflict with, and thus exempt the Band from, the MICSA provision subjecting all Maine tribes to state law, 25 U.S.C. § 1725(a). Their discussion of potential conflicts is, however, beside the point because § 1725(a) no longer applies to the Micmacs. I agree with the Band that, except where otherwise stated in ABMSA, that act supplants MICSA with respect to the Micmacs' status. ABMSA was enacted to replace MICSA on all matters for which the Band should have received individualized recognition in the earlier statute – as did the Passamaquoddys, the Penobscots and the Maliseets. In effect, Congress retrieved the Micmacs from the MICSA catch-all provisions that applied to "all other tribes or bands of Indians" and, in a detailed and comprehensive enactment, defined the Micmacs' new status as the fourth Maine tribe to be recognized and compensated for the loss of their aboriginal holdings.

I recognize the canon of statutory construction, cited by the majority, that two statutes capable of co-existence must both be regarded as effective, "absent a clearly expressed congressional intention to the contrary." Morton v. Mancari, 417 U.S. 535, 551

(1974); see also United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 10 (1st Cir. 2005) ("Inconsistency between . . . two statutes . . . is not enough: 'where two seemingly inconsistent acts can reasonably stand together, a court must interpret them in a manner which gives harmonious operation and effect to both, in the absence of clear and unambiguous expression of Congressional intent to the contrary.'") (citations omitted).  The issue, however, is not whether the two statutes may co-exist – I agree that they may – but what effect ABMSA had on MICSA's applicability to the Micmacs.

In my view, it is apparent that ABMSA replaces the general "all other tribes" approach of MICSA, as it may have applied to the Band, with a specific statute premised on federal recognition of the Band.  In its coverage of subjects addressed in MICSA, this separate statutory settlement with the Micmacs parallels MICSA's settlement with the other named tribes.  In fact, Congress included language in ABMSA reflecting such an intent.  In ABMSA's "Findings and policy" section, Congress observed that "[t]he Band was not referred to in [MICSA]" because its historical presence in Maine had not yet been documented, § 2(a)(2) (emphasis added), and further stated that "[i]t is now fair and just to afford the [Micmacs] the same settlement provided to the [Maliseets] . . . to the extent they would have benefitted from inclusion in the Maine Indian Claims Settlement Act of 1980,"

§ 2(a)(5) (emphasis added).  Congress thus enacted ABMSA because, after closer scrutiny of the Band's history, lawmakers saw the need to redress the Band's omission from MICSA as a federally recognized tribe.

Despite an expressed intent to afford the Band the same settlement as the Maliseets, it is telling that Congress did not simply amend MICSA to extend like terms to the Micmacs.  Rather, Congress specified in ABMSA's provisions various entitlements for the Band, including a $900,000 land acquisition fund, see § 4(a), federal recognition, see § 6(a), and the right to "organize for its common welfare," see § 7(a).  ABMSA also contains provisions that parallel MICSA's on the Band's eligibility for financial benefits and for special services from the federal government.  Compare ABMSA §§ 6(a), (c) with 25 U.S.C. § 1725(i).

In addition, as the majority acknowledges, ABMSA explicitly incorporated MICSA provisions governing the applicability of federal law, see § 6(b), and implementation of the Indian Child Welfare Act, see § 8.[31]  If MICSA continued to apply

---

[31] Section 6(b), which is labeled "Application of Federal law," states: "For the purposes of application of Federal law, the Band and its lands shall have the same status as other tribes and their lands accorded Federal recognition under the terms of [MICSA]." Section 8, which is labeled "Implementation of the Indian Child Welfare Act," provides:

> For the purposes of this section, the Band is an 'Indian tribe' within the meaning of section 4(8) of the Indian Child Welfare Act of 1978 (25 U.S.C. 1903(8)), except that nothing in this section shall alter or affect the

to the Micmacs independently of such references in ABMSA, there would be no need for ABMSA to explicitly incorporate particular MICSA provisions. The majority offers an explanation for the overlap with respect to § 8 – observing that it clarifies the applicability of the Indian Child Welfare Act in Maine – but does not explain the need to adopt MICSA's terms for the applicability of federal law in § 6(b). In my view, the reason for both is the same: where Congress wanted MICSA's provisions to continue to apply to the Micmacs, it knew that it had to say so explicitly because ABMSA replaced MICSA with respect to the Band. Congress also took this approach with MICSA's universal extinguishment of claims of aboriginal title to Maine lands, explicitly recognizing that the Band remained bound by that portion of the earlier statute. See ABMSA § 2(a)(3) (noting that the Micmacs "could have asserted aboriginal title" to lands in Maine "but for the extinguishment of all such claims by the Maine Indian Claims Settlement Act of 1980").

The specificity and completeness of ABMSA are persuasive evidence that the Act was clearly intended by Congress as a comparable, but independent, statement of the benefits and limitations applicable to the Band. The majority wrongly dismisses the Band's argument that ABMSA's reference to particular MICSA

jurisdiction of the State of Maine over child welfare matters as provided by [MICSA].

provisions, and not others, is significant, see supra pp. 41-42 (observing that the lack of reference to MICSA's § 1725(a) – the section imposing state jurisdiction on the tribes – is "easily explained" because ABMSA "clearly contemplates that the state Micmac Act will have effect," and the state act "contains language nearly identical to MICSA's § 1725(a)"). That, of course, is precisely my point: in fully addressing the status of the Micmacs in ABMSA, Congress intended and expected that state jurisdiction over the Band would be accomplished by means of the state Micmac Act. Section 1725(a) was not mentioned because it was no longer pertinent; as with all other facets of the Micmacs' status, Congress enacted a new, specific provision to govern the Band's relationship with the State.

The majority misses the larger context when it briefly rejects the notion that ABMSA impliedly repealed § 1725(a). As my discussion shows, the issue here is not whether MICSA or any of its particular provisions were repealed through ABMSA. They were not. Rather, as the Band has argued, ABMSA simply rendered MICSA inapplicable to the Micmacs – except where specifically incorporated.[32]  Moreover, even if we viewed this case from the

_____

[32] The majority asserts that my view that AMBSA wholly supplants MICSA was not argued by the Band. That is not so. In its brief, the Band argued that "[u]nder well-settled rules of construction, MICSA provisions may apply to the Band only as provided in ABMSA." Br. at 55. The Band then goes on to discuss the two incorporated MICSA provisions noted by the majority:

perspective of implied repeal, the all-embracing nature of ABMSA would meet the standard to show Congressional intent to "repeal" MICSA insofar as it applied to the Micmacs. Cf. Posadas v. Nat'l City Bank, 296 U.S. 497, 503 (1936) ("[I]f the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act."); Lahey Clinic Hosp., 399 F.3d at 10 (noting that implied repeal of a federal statute may be shown if, "by clear and manifest intent," a later act "covers the whole subject matter area and was meant as a substitute") (citing Kremer v. Chem. Constr. Corp., 456

---

For example, Congress enumerated in ABMSA § 8(a) that the MICSA Child Welfare provisions apply to the Micmac. ABMSA § 6(b) provides that federal law will apply to the Band as it does to other Maine tribes in MICSA. If Congress intended that all or any other parts of MICSA would apply to the Band, then it would not have specified those it did and not the others. It is a "fundamental principle of statutory construction that the specific trumps the general." . . . Clearly, all of MICSA cannot apply to the Band without rendering the specific inclusions meaningless surplusage.

Id. at 55-56. This position was also articulated by the Band at oral argument. In explaining the Micmacs' position in response to questions from the panel, counsel for the Band stated:

The 1980 law except where expressly . . . noted by Congress cannot apply to deny the Band its right to self-government. Congress created a wholly separate statute for the Micmac. . . . The 1991 Act, and only the 1991 Act, except where Congress noted . . . the 1980 Act would apply . . .

At that point, a panel member asked: "So, the '91 Act basically eliminates the 1980 Act except where it expressly repeats?" Counsel replied: "Correct, your honor, that is our argument."

U.S. 461, 468 (1982)); Granite State Chapter, Assoc. of Civilian Tehnicians v. Fed. Labor Relations Auth., 173 F.3d 25, 27 (1st Cir. 1999) ("If one Congress clearly and manifestly makes known its intent to supplant an existing law, a court can find repeal by implication."). That the progression from MICSA to ABMSA is from a general statute to a specific one lends additional support to the view that AMBSA effectively "repealed" MICSA with respect to the Band. Cf. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985) (noting the "strong presumption against repeals by implication, . . . especially an implied repeal of a specific statute by a general one") (citations omitted).

Congress's intention to replace MICSA with ABMSA for the Micmacs is evident in ABMSA's approach to the issue of state jurisdiction over the Band. ABMSA neither invokes MICSA nor in its own terms subjects the Band to state law. Instead, it states as an express purpose the ratification of "the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs." § 2(b)(4). By explicitly deferring to MSA on the issue of state jurisdiction without any reference to MICSA, ABMSA states, in effect, that MICSA is no longer the governing law on the Micmacs' relationship with the State.[33]

---

[33] The MSA jurisdiction provision states, in relevant part: "[T]he Aroostook Band of Micmacs and all members . . . shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person . . . ." Me. Rev. Stat. Ann. tit. 30, § 7203.

The view of the majority that MICSA could be reactivated as a default, imposing state law on the Micmacs in the face of any statutory gap that may have occurred because of the failed enactment of MSA, might be more persuasive if MICSA and MSA contained identical jurisdictional provisions. In such circumstances, one could more plausibly argue that ABMSA was intended to reaffirm an ongoing relationship, first defined by MICSA. MICSA, however, included two separate provisions establishing the State's authority over its resident tribes. See 25 U.S.C. § 1725(a), (d)(1). MSA did not include the second of these – the "sue and be sued" provision that typically is used to signify a waiver of immunity from suit. See, e.g., Gómez-Pérez v. Potter, 476 F.3d 54, 57 (1st Cir. 2007). Whether or not that omission is significant on the question of sovereign immunity, it is a further indication that ABMSA was a distinct and independent enactment that replaced MICSA with respect to the Micmacs. To resurrect statutory provisions from MICSA when Congress in ABMSA effected (through attempted ratification of MSA) a different governing framework for the Band's relationship with the State is unsupportable – and inconsistent with "a clearly expressed congressional intention to the contrary," Morton, 417 U.S. at 551.

My view that ABMSA replaced MICSA as the federal law governing the Band's status and defining the Micmac-Maine relationship – and that MICSA therefore may not be invoked as a

-60-

default – is reinforced by comments from every member of Maine's Congressional delegation at the time of ABMSA's passage. In urging a favorable vote on the statute, then-Senators Cohen and Mitchell and then-Representatives Andrews and Snowe all emphasized the need for the new legislation because of the Micmacs' "omission from the 1980 Maine Indian Claims Settlement Act." 137 Cong. Rec. H9,652, 9,655 (1991); see also 137 Cong. Rec. S13,360, 13,362 (1991). Among other comments, Senator Mitchell observed:

> The Micmacs' exclusion from the 1980 Maine Indian Claims Settlement Act left them in a unique situation, where they have no State Indian assistance and are ineligible for Federal assistance. The bill the Senate is considering today will establish the historical presence of the Micmacs in Maine and provide Federal recognition to the band.

137 Cong. Rec. at S13,362 (emphasis added).

Senator Cohen assured his colleagues that "[t]he bill does not amend the 1980 act, and we do not intend that any of the issues covered in that landmark legislation will be reopened or reconsidered." 137 Cong. Rec. at S13,362. In other words, Congress began with a clean slate in giving the Band – singularly excluded from MICSA – due recognition for its historical presence in Maine. To the extent that Congress wanted to draw on MICSA in drafting ABMSA, it cited the specific provisions of MICSA that it wished to incorporate into ABMSA.

ABMSA's conflicts provision, § 11, reflects this approach. The provision states: "In the event of a conflict of

-61-

interpretation between the provisions of the Maine Implementing Act, the Micmac Settlement Act, or the Maine Indian Claims Settlement Act of 1980 . . . and this Act, the provisions of this Act shall govern." MICSA remained in effect, and Congress undoubtedly recognized that the general language in MICSA and the more specific language in ABMSA covered some of the same subject matter. It thus sought to ensure that any seeming conflicts between the two would be resolved by deferring to ABMSA's provisions – reinforcing ABMSA's preemptive effect on the matters it covered.[34]

---

[34] The majority states that "[t]here is no reason to believe that Congress intended to repeal § 1725(a) insofar as it provided a default rule in the event that the state Micmac Act were ineffective for some reason." See supra p. 45 (emphasis in original). The majority thus speculates that Congress would have invoked MICSA's jurisdictional provision as a default if it had anticipated the ineffectiveness of the state law. That speculation is improper for at least two reasons. First, as noted infra, it is not inevitable that Congress would have legislated a specific relationship for Maine and the Micmacs if the State itself failed to do so. Congress did not explicitly incorporate in ABMSA the substance of MSA, and it may have made a deliberate choice to allow the State to define its own jurisdictional relationship with the Band. Moreover, even if there were a basis for a presumed congressional intent to impose state jurisdiction on the Band comparable to that found in MICSA, that is no justification for rewriting ABMSA. Judgments about congressional intent must have some basis in the language of the relevant statute, even if that language is ambiguous. The majority would incorporate by judicial fiat a default provision that would read something like this: "If the Maine Settlement Act fails to take effect, the Micmacs shall be subject to the jurisdictional terms of MICSA § 1725(a)." There is not a hint of such language in ABMSA.

Elsewhere, my colleagues note that, even if Congress through ABMSA had substituted MSA for MICSA with respect to state jurisdiction over the Band, "the correct conclusion would be that

-62-

In sum, every indicator points to a congressional intent to supplant MICSA for the Micmacs in all respects in which that earlier statute was not explicitly extended by ABMSA's terms. Thus, I can only conclude that, after passage of ABMSA, MICSA no longer controlled Maine's jurisdiction over the Aroostook Band of Micmacs.

## II.

My conclusion that ABMSA, rather than MICSA, governs Maine's authority to impose its employment discrimination laws on the Band requires me to evaluate the Maine Micmac Act. ABMSA relied wholly on the state act to "define[] the relationship between the State of Maine and the Aroostook Band of Micmacs," § 2(b)(4), and I therefore must confront the Band's challenge to the validity of MSA. In a thoughtful and thorough discussion, the magistrate judge considered whether that statute may be deemed valid even though several statutory prerequisites to its effectiveness – including a requirement that it be certified by the

---

ABMSA had simultaneously ratified the relevant provision of the act into federal law." This assertion reflects the same flawed judgment about Congress's intent. The statute that Congress passed does not by its own terms impose state jurisdiction on the Band. Consequently, ABMSA's purpose to ratify MSA may reflect only an intent to endorse whatever jurisdictional relationship Maine enacted into law, and not an intent to adopt a particular Maine-Micmac relationship as a matter of federal law. Congress could have adopted the substance of MSA's jurisdictional provision by incorporating it into ABMSA (as MICSA incorporated the jurisdictional provisions of the Maine Implementing Act), but Congress did not do so.

Band within sixty days of the 1989 Legislature's adjournment – were not met.[35]  See Aroostook Band of Micmacs, 403 F. Supp. 2d at 118-22.  I agree with her assessment that it may not.[36]

The required certification cannot be cast aside as a mere technicality.  Given the complex relationship between Maine and its tribes, it would be both injudicious and disrespectful to ignore an express requirement of consent contained in a settlement act.[37] Indeed, ABMSA and MSA carry the consent requirement through to future amendments regarding jurisdiction, see 30 Me. Rev. Stat. Ann. tit. 30, § 7201 (Historical and Statutory Note); ABMSA § 6(d). Therefore, on this jurisdictional issue in particular, securing the Band's formal agreement was deemed necessary.

_____

[35] In the official codification, a note is appended to each section of MSA stating that the provision was added to the code "pending receipt of certification of agreement by Council of Aroostook Band of Micmacs."  The notes following each subsection state that the act will become effective only if: (1) the United States enacts ratifying legislation that approves the act without modification; (2) the United States consents to amendments that would be made with the consent of the Aroostook Band of Micmacs; and (3) within sixty days of the Legislature's adjournment, the Secretary of State receives written certification from the tribal council that the Band has agreed to the act.  It is undisputed that no certification was received by the Secretary of State.

[36] The majority opinion notes that whether the state Micmac Act became effective is a "difficult and complex issue of state law," and my colleagues are reluctant to decide it without guidance from the Maine Supreme Judicial Court.  As I shall explain, the issue is neither complicated nor just a matter of state law.

[37] As noted by the majority, the certification provision and the other contingencies for effectiveness were added to the pending Micmac bill late in the legislative process.  The Band did not learn of the certification requirement until 1997.

As the magistrate judge pointed out, strict adherence to the consent procedure is consistent with a 1985 legal opinion from Maine's Attorney General concerning a similar certification requirement in the "Act Relating to the Time of Penobscot Nation Trust Land Acquisition." That act required the Penobscot Nation to submit written certification of its agreement with the act's provisions within sixty days of the legislature's adjournment. The tribe's certification was received two days late, and the Attorney General concluded that the only remedy was to reenact the legislation. He observed:

> While this is unfortunate, I feel it is especially necessary to be strict in interpreting these provisions in that it deals with the question of land acquisition. Indeed, any other conclusion . . . could render a land transaction subject to legal challenge by third parties.

Although MSA does not focus on the question of land acquisition, it is of comparable significance because the statute would diminish the Band's sovereign rights. Cf., e.g., Penobscot Nation v. Fellencer, 164 F.3d 706, 709 (1st Cir. 1999) (noting that courts are obliged "to construe 'acts diminishing the sovereign rights of Indian tribes . . . strictly'") (quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir. 1994)). Moreover, the Legislature added the certification requirement to MSA in the face of the Attorney General's previously issued opinion, with the presumptive understanding that a failure to meet

-65-

it could prevent the statute from taking effect.  The formalities of legislative enactments often have substantive importance.  In the context of Indian sovereignty, it would be particularly inappropriate to ignore an express statutory term protective of that sovereignty.

Indeed, while MSA's efficacy is technically an issue governed by Maine law, the limitation it purportedly imposes on the Band's sovereignty implicates federal concerns as well.  States may not assert jurisdiction over tribes without congressional approval, see Three Affiliated Tribes of Fort Berthold Reserv. v. Wold Eng'g, 476 U.S. 877, 891 (1986) ("[I]n the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States."); Fellencer, 164 F.3d at 709 ("[O]nly Congress can abrogate or limit an Indian tribe's sovereignty."), and courts must remain sensitive to the federal interest even when sovereignty issues arise from state law.  Noting that this is a "unique case and there is no controlling authority either way," appellants urge the court to find implied certification based on the Band's expressed support of MSA at the time of its enactment.  On matters of Indian sovereignty, however, the magistrate judge is certainly correct that a court may not "finesse what is clearly the absence of a state legislative imposed precondition to the statute's valid enactment."  403 F. Supp. 2d at 121.

Moreover, as with the issue of land acquisition, compliance with the certification requirement could have reduced the risk of time-consuming and expensive future conflicts. If the Band's governing body had discussed and voted on the certification, tribal officials would have had the opportunity to crystallize their expectations and clarify matters of concern, and the Band's formal commitment to the agreement would have protected the State from later claims that the Band objected to certain of its terms. Failure to obtain the Band's consent was not, as appellants argue, simply an "irregularity in the final execution of the agreement." To find implied consent would be to override the very purpose of a certification provision.

I also join the magistrate judge in rejecting the notion that Congress's expression of purpose to ratify MSA effectively validated the statute – or served to incorporate its substantive provisions into federal law. Unlike MICSA, which affirmatively states that the tribes shall be "subject to the civil and criminal jurisdiction of the State," 25 U.S.C. § 1725(a), or, in the case of the Passamaquoddy Tribe and Penobscot Nation, "subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act," id. § (b)(1), ABMSA does not directly refer to the State's jurisdiction. Instead, it defers to state law to "define[] the relationship between the State of

-67-

Maine and the Aroostook Band of Micmacs."[38]  The silence in the federal statute, in light of Congress's otherwise comprehensive treatment of the Band's status, reflects a lack of affirmative intent on the issue.  From all that appears, Congress was content in 1991 to leave the relationship between the Band and the State to Maine law.  While Congress unquestionably anticipated a limitation on the Band's sovereignty through MSA, it would be reading beyond the text to construe the purpose provision to mandate such a limitation.  I see no basis for invigorating a state statutory enactment that fails as a matter of state law, and which Congress has not replicated as a discrete statutory provision within ABMSA.

It has now been nearly ten years since the certification problem surfaced, casting doubt on the validity of MSA and its assertion of state jurisdiction over the Band.  In the well stated words of the magistrate judge: "There is no doubt that Congress did (and still does) have the power to enact federal legislation which, despite the lack of an effective state law, included the terms of that legislation in the federal act[,] making those terms federal law."  403 F. Supp. 2d at 122.  Congress has so far not chosen to act, and the courts are not at liberty to fill the gap.[39]

---

[38] As noted earlier, § 2(b) provided, in relevant part, that "It is the purpose of this Act to – (4) ratify the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs."

[39] I fully agree with the magistrate judge that the lack of a severability provision in ABMSA does not mean that the entire

**III.**

I recognize that my conclusions about ABMSA and MSA lead to an anomalous result – the Micmacs are the sole Maine tribe not subject to some level of state jurisdiction. But courts may not ignore established principles of statutory construction or the canons of Indian law to avoid uncomfortable outcomes. The failure of MSA to take effect means that the Micmacs were left with the sovereign rights they otherwise would hold as a recognized Indian tribe under ABMSA. See Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 62 (1st Cir. 2005) ("A tribe retains those aspects of sovereignty that have not been 'withdrawn by treaty or statute, or by implication as a necessary result of [the tribe's] dependent status.'") (quoting United States v. Wheeler, 435 U.S. 313, 323 (1978)) (alteration in original), overruled on other grounds by Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16 (1st Cir. 2006) (en banc)[40]; Fellencer, 164 F.3d at 709. Although that

---

statute must be held invalid based on MSA's ineffectiveness, which frustrated only one of ABMSA's purposes. Like her,

> I am uncomfortable with the notion of reading an entire Congressional enactment out of existence, not because it is unconstitutional, but because one of its stated purposes has apparently failed. Congress can easily remedy that failure by adopting the terms of the [MSA] itself, if it chooses to do so.

403 F. Supp. 2d at 123.

[40] Narragansett rejected the distinction drawn in Aroostook Band of Micmacs between tribal sovereignty and tribal sovereign immunity. See 449 F.3d at 24-25.

outcome is not what Congress anticipated,[41] it is nonetheless the inevitable result of the choice Congress made to explicitly rely on the state Micmac Act to frame the Maine-Micmac relationship.[42]

---

[41] With quotations from two cases, the majority suggests that my statutory interpretation is indefensible because it would produce "absurd results" or "'a chaotic hiatus in the law.'"  I reject those characterizations.  The restoration of Micmac sovereignty beyond what Congress had anticipated could hardly be called "absurd" and surely would not create "chaos."

[42] I am not alone in reaching this conclusion.  The same view was expressed in a memorandum prepared by Philip N. Hogen, an Associate Solicitor for the Department of the Interior, in connection with Maine's application to administer the Maine Pollutant Discharge Elimination System within Indian country. Hogen's five-page memorandum was submitted to the Office of General Counsel of the U.S. Environmental Protection Agency along with a 31-page memorandum prepared by counsel for the Micmacs (who is also counsel for the Micmacs in this case) in consultation with attorneys from the Department of the Interior and the Department of Justice.  Hogen noted that "[t]he Micmacs' detailed legal memorandum incorporates comments from the two Departments and we concur with its conclusions."  His memo stated:

> The Department, as the primary federal agency responsible for interpreting the Maine Indian settlement acts, has analyzed the legal status of the Aroostook Band of Micmac Indians (Micmacs) and we conclude that under the Aroostook Band of Micmac Settlement Act (ABMSA), the Micmacs have retained their inherent tribal sovereignty.

The substance of the memo's analysis is reflected in three section headings: (1) "The 1989 State and 1991 Federal Micmac Settlement Acts Replaced the Earlier Settlement Acts to the Extent the Earlier Acts Applied to the Micmacs," (2) "The [MSA] does not Subject the Micmacs to State Law because the [MSA] Never Became Effective," and (3) "Congress Intended the [MSA] and ABMSA to Embody the Settlements with the Micmacs, thereby Repealing the Provisions of the [Maine Implementing Act] and MICSA Previously Applicable to the Micmacs."  In the last of those sections, the memo states: "To the extent Congress intended the earlier settlement acts to continue to apply to the Micmacs, Congress specified those sections in the ABMSA."

Our prior case law establishes that the sovereign rights retained by the Band foreclose application of the state's employment discrimination laws to the Micmacs. Cf. Fellencer, 164 F.3d at 711-13 (rejecting employment discrimination claim against the Penobscot Nation, relying, inter alia, on "'the longstanding federal policy of providing a unique legal status to the Indians in matters of tribal employment'") (quoting Morton v. Mancari, 417 U.S. 535, 548 (1974)). I would therefore affirm the judgment of the magistrate judge.